UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JONATHAN FERDANDES,

           Petitioner,

    v.

UNITED STATES OF AMERICA,

           Respondent.

---

**DECISION AND ORDER**

6:14-CR-06043 EAW
6:18-CV-6507 EAW

## I.    <u>INTRODUCTION</u>

Jonathan Fernandes ("Petitioner" or "Fernandes") has filed a *pro se* motion pursuant to 28 U.S.C. § 2255 ("Section 2255") to vacate, set aside, or correct his sentence.  (Dkt. 198).[1]  Petitioner asserts a due process error in connection with his sentence as well as ineffective assistance of trial and appellate counsel.  For the reasons set forth below, Petitioner's Section 2255 motion is denied.

## II.    <u>BACKGROUND</u>

On September 11, 2014, a grand jury returned a Superseding Indictment (Dkt. 41) charging Petitioner with manufacture of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) (Count 1); possession with intent to distribute and distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Counts 2 and 5); maintaining a drug-related premises in violation of 21 U.S.C. § 856(a)(1)

---

[1]    All references to the docket ("Dkt.") in this Decision and Order are to the docket in Criminal Action No. 1:14-CR-06043 EAW.

(Counts 3, 7, and 11); possession of firearms in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A) (Counts 4, 8, and 12); possession of materials used to manufacture a controlled substance in violation of 21 U.S.C. §§ 843(a)(6) and 843(d)(2) (Counts 6 and 10); possession of a listed chemical with intent to manufacture a controlled substance in violation of 21 U.S.C. § 841(c)(1) (Count 9); possession of a detectable amount of marijuana in violation of 21 U.S.C. § 844(a) (Count 13); and witness tampering in violation of 18 U.S.C. §§ 1512(b)(1) and 2 (Count 14).  The Superseding Indictment also set forth a forfeiture allegation for thirteen firearms and multiple rounds of ammunition.

Petitioner pleaded not guilty and proceeded to trial before this Court in August of 2015.  He was represented by Assistant Federal Public Defender Robert G. Smith ("Mr. Smith" or "trial counsel").[2]  A jury convicted Petitioner on Counts 1, 2, 3, 5, 6, 7, 9, 10, 11, 13 and 14; and acquitted him on Counts 4, 8, and 12.  (Dkt. 143).

On January 8, 2016, the Court sentenced Petitioner principally to an aggregate sentence of 240 months imprisonment, that is, concurrent sentences of 240 months on Counts 1, 2, 3, 5, 7, 9, 11 and 14; 120 months on Counts 6 and 10; and 12 months on Count 13. (Dkt. 173).  Judgment was entered on January 20, 2016 (*id.*), and Petitioner timely filed a Notice of Appeal (Dkt. 174).

---

[2]     Petitioner was also represented at trial by Assistant Federal Public Defender Jeffrey L. Ciccone, but Mr. Smith served as lead counsel and Petitioner focuses his claims on Mr. Smith's actions.

On appeal, Petitioner was represented by Assistant Federal Public Defender Jay S. Ovsiovitch ("Mr. Ovsiovitch" or "appellate counsel").   In the appellate brief, Mr. Ovsiovitch raised the following arguments: (1) the evidence was legally insufficient to support the conviction on Count 14 for witness tampering; (2) the sentence on Count 14 was procedurally erroneous and substantively unreasonable; and (3) this Court erred in finding a nexus between the firearms and criminal activity for purposes of sustaining the order of forfeiture.   The Second Circuit Court of Appeals unanimously affirmed this Court's Judgment. *United States v. Konopski (Jonathan Fernandes)*, 685 F. App'x 63 (2d Cir. 2017).  Regarding the claims involving the witness tampering conviction and sentence, the Second Circuit held that "the evidence was easily sufficient for a reasonable jury to find Fernandes guilty of aiding and abetting witness  tampering," *id.* at 65-66, and that Fernandes had "not shown any procedural error or substantive unreasonableness in [the] sentence" for witness tampering. *Id.*  Finally, the Second Circuit held, "the district court's finding that all of the weapons were involved in and facilitated Fernandes's drug crimes was not clearly erroneous." *Id.* at 67.

On July 9, 2018, Petitioner filed this timely Section 2255 motion along with a memorandum of law (Dkt. 198),[3] raising the following grounds for relief: the Court

---

[3]     The Section 2255 motion and the supporting memorandum of law are both contained in Dkt. 198.  However, there are separate sets of page numbers for the motion and the memorandum.  For clarity, when citing to Dkt. 198, the Court will use the page numbers indicated by Petitioner for the motion ("Mot.") or the memorandum ("Mem.") and refer to "Mot." or "Mem." depending on which portion of Dkt. 198 is being referenced. For all other documents filed in this case, the Court will refer to "Dkt." and the appropriate page number.  Unless otherwise indicated, the page numbers used will be those included by the parties rather than the pagination automatically generated by CM/ECF.

violated Petitioner's due process rights by increasing his sentence based on acquitted conduct (Ground One); trial counsel was ineffective for ignoring Petitioner's request to call several witnesses, failing to request a specific jury instruction on informant testimony, and failing to argue national sentencing disparities (Grounds Two, Three, and Four); and appellate counsel was ineffective for failing to assert a suppression issue on direct appeal (Ground Five).  (*See* Mot. at 5-6).  The Government filed a response (Dkt. 203) and exhibits (Dkt. 203-1).  Petitioner filed a reply.  (Dkt. 204).

## III.   DISCUSSION

### A. Legal Standard

A prisoner in federal custody may challenge the validity of his sentence by filing a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2255, to vacate, set aside, or correct his sentence.  *See* 28 U.S.C. § 2255(a).  "Section 2255 provides relief in cases where the sentence: (1) was imposed in violation of the U.S. Constitution or the laws of the United States; or (2) was entered by a court without jurisdiction to impose the sentence; or (3) exceeded the maximum detention authorized by law; or (4) is otherwise subject to collateral attack."  *Adams v. United States*, 372 F.3d 132, 134 (2d Cir. 2004) (citing 28 U.S.C. § 2255).

"In reviewing a *pro se* petition for habeas corpus, the Court must be mindful that '[a] document filed *pro se* is to be liberally construed, and a *pro se* [pleading], however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'"  *Harris v. United States*, No. 6:14-CR-6149 EAW, 2020 WL 4059198, at *2-

3 (W.D.N.Y. July 20, 2020) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotations and citations omitted in original; further citation omitted)).

### B. Merits of Petitioner's Claims

#### 1. Erroneous Consideration of Acquitted Conduct (Ground One)

Petitioner asserts that the Court violated his due process rights in determining his sentence because it adopted certain findings in the presentence investigation report ("PSR") (Dkt. 194), namely that (1) the conduct underlying the 18 U.S.C. § 924(c) charges (Counts 4, 8, 12), on which he was acquitted, justified a two-level increase to the base offense level pursuant to United States Sentencing Guideline ("Guideline") § 2D1.1(b)(1) (possession of a dangerous weapon); and (2) he was accountable for at least 1,568.93 grams of methamphetamine, even though the jury determined he was culpable for more than 50 but less than 500 grams of methamphetamine. (*See* Mot. at 5; Mem. at 12-13). Relying on *Nelson v. Colorado*, 137 S. Ct. 1249 (2017), Petitioner argues that the Fifth Amendment's due process clause forbids consideration at sentencing of conduct that has not resulted in a conviction. (*See* Mem. at 8-13).

In *Nelson*, the Supreme Court addressed a Colorado statute governing recoupment of court costs by criminal defendants whose convictions subsequently were reversed or vacated. *Nelson*, 137 S. Ct. at 1254-55. Before they could be refunded costs and fees or awarded restitution, the defendants were required to prove their innocence by clear and convincing evidence in a separate civil proceeding. *Id.*

The Supreme Court noted that under its precedents, reversal of a conviction restores the presumption of innocence. *Id.* at 1255 (citation omitted). Colorado's statutory scheme,

on the other hand, improperly presumed a defendant "adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions." *Id.* (emphasis in original). Finding that Colorado's scheme ran afoul of the Fourteenth Amendment's procedural due process clause, *id.* at 1257, the Supreme Court held that "a State may not impose anything more than minimal procedures on the refund of exactions dependent upon a conviction subsequently invalidated." *Id.* at 1258.

Petitioner argues that *Nelson* overruled *United States v. Watts*, 519 U.S. 148 (1997) (*per curiam*), which held that a court may consider acquitted conduct in fashioning a sentence, so long as the conduct was proven by a preponderance of the evidence. *See id.* at 157 (holding that even a jury's acquittal "does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence"); *see also United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005) ("[D]istrict courts may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct."). The government argues that *Nelson* did not overrule *Watts* and that because it involved a state sentence, *Nelson* has no bearing on Petitioner's federal sentence. (*See* Dkt. 203 at 4-6).

*Nelson* did not mention *Watts*. Petitioner therefore is arguing that *Nelson* overruled *Watts sub silentio*. However, the Supreme Court has cautioned that its "decisions remain binding precedent until [it] sees fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continued vitality." *Hohn v. United States*, 524 U.S. 236, 252-53 (1998). "Given this caution, the Supreme Court does not normally overrule

- 6 -

prior opinions *sub silentio*." *United States v. Burg*, 764 F. App'x 836, 837 (10th Cir. 2019) (citation omitted). Accordingly, "every . . . circuit court to consider the issue ha[s] stated in nonprecedential opinions that *Nelson* did not overrule *Watts sub silentio*." *Id.* (citing *United States v. Swartz*, 758 F. App'x 108, 112 n.4 (2d Cir. Dec. 18, 2018) (rejecting defendant's argument that *Nelson* overruled *Watts*); *United States v. Johnson*, 732 F. App'x 638, 660 n.19 (10th Cir. 2018) (declining to presume that *Nelson* overruled *Watts*); *United States v. Chapman-Sexton*, 758 F. App'x 437, 442-43 (6th Cir. 2018) ("*Nelson* . . . does not *sub silentio* overrule *United States v. Watts*.")). Based on the foregoing authorities, the Court declines Petitioner's invitation to find that *Nelson* overruled *Watts.*

Moreover, the Tenth Circuit observed *Nelson* did not consider whether "relevant conduct could be used at sentencing" or the "constitutionality of considering uncharged conduct at sentencing." *Id.* Therefore, it has no applicability to the claim Petitioner raises here. *See Swartz*, 758 F. App'x at 112 n. 4 ("*Nelson* did not address what type of evidence or conduct may be considered when a court sentences a defendant whose conviction is otherwise valid, and therefore *Nelson* is inapplicable here[,]" where defendant argued the sentencing court violated his rights by considering uncharged conduct). Since *Watts* remains controlling precedent, it forecloses habeas review of Petitioner's claim that this Court unconstitutionally considered acquitted conduct at sentencing. *See, e.g.*, *Burg*, 764 F. App'x at 837 (holding that *Nelson* did not overrule *Watts* and affirming district court's rejection of petitioner's claim that *Nelson* newly recognized a constitutional right precluding the sentencing court from considering conduct that had not resulted in a conviction).

### 2. Ineffective Assistance of Trial Counsel (Grounds Two, Three, and Four)

To succeed on a claim that counsel did not provide constitutionally effective assistance, the petitioner must "demonstrate both (1) that counsel's performance was so unreasonable under prevailing professional norms that 'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment,' *Strickland v. Washington*, 466 U.S. 668, 687 (1984); and (2) that counsel's ineffectiveness prejudiced the [petitioner] such that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,'" *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004) (quoting *Strickland*, 466 U.S. at 694; citations omitted).

When assessing an attorney's performance, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 90, 101 (1955)). In evaluating prejudice, it is "not enough" for the Court to find "that the errors had some conceivable effect on the outcome of the proceeding[,]" since "[v]irtually every act or omission of counsel would meet that test[.]" *Id.* at 693 (citation omitted). Rather, the error must have been so serious as to "undermine confidence in the outcome." *Id.* at 694. Thus, a petitioner "bears a heavy burden" under *Strickland*. *Gaskin*, 364 F.3d at 468.

"Although a prisoner may not use a § 2255 petition to re-litigate issues that were decided against him on direct appeal, '[a]n ineffective-assistance-of-counsel claim may be

brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal.'" *Harris*, 2020 WL 4059198, at *3 (quoting *Massaro v. United States*, 538 U.S. 500, 504 (2003)).

### a. Claim that Mr. Smith Failed to Investigate and Call Witnesses (Ground Two)

Petitioner contends that Mr. Smith provided ineffective assistance by failing to call "several key witnesses" to testify for the defense—Torrie Savunen ("Savunen"); Dylan Lutz ("Lutz"), Petitioner's then-girlfriend; Melissa Johnson ("Johnson"); Steve Hall ("Hall"); and Melissa Sherwood ("Sherwood"). (*See* Mem. at 15-17). Petitioner indicates Savunen, Lutz, and Johnson were interviewed by the defense investigator, Karen Francati. (*Id.* at 15-16). Hall and Sherwood were not interviewed, despite Petitioner's request to Mr. Smith. (*Id.* at 16-17). Petitioner asserts that he is "in the process of securing affidavits" for Johnson, Sherwood, and Hall, and states that these affidavits "will be included in the Appendix to this brief." (*Id.* at 23). However, there was no Appendix submitted with Dkt. 198, and no affidavits or other statements subsequently have been submitted to the Court. The government counters that the decision not to call these witnesses was a matter of trial strategy and that any prejudice from failing to call them is purely speculative. (*See* Dkt. 203 at 13-16).

The decision "whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987), *cert. denied*, 484 U.S. 958 (1987). Such decisions "if reasonably made, will not constitute a

basis for an ineffective assistance claim." *Id.*; *see also United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."), *cert. denied*, 538 U.S. 1021 (2003).  "Moreover, a petitioner does not show that he was prejudiced by trial counsel's alleged deficient performance merely by asserting that certain witnesses might have supplied relevant testimony; rather, he must state exactly what testimony they would have supplied and how such testimony would have changed the result." *Carr v. Senkowski*, No. 01-CV-689, 2007 WL 3124624, at *20 (W.D.N.Y. Oct. 23, 2007)  (citing, *inter alia*, *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).  The petitioner also must show that the witness would have testified at trial.  *See, e.g.*, *Alexander*, 775 F.2d at 602; *Carr*, 2007 WL 3124624, at *22.  "Courts have viewed claims of ineffective assistance of counsel skeptically when the only evidence of the import of a missing witness' testimony is from the [petitioner]." *Croney v. Scully*, No. CV-86-4335, 1988 WL 69766, at *2 (E.D.N.Y. June 13, 1988) (citing *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir.), *cert. denied*, 467 U.S. 1251 (1984)), *aff'd*, 880 F.2d 1318 (2d Cir. 1989).

Sherwood and Hall "would be willing to testify," (Mem. at 16), according to Petitioner, but he provides no information about what their proposed testimony would be or how it would have affected the verdict.  Petitioner's allegations about these two witnesses are simply too conclusory to state a cognizable claim under *Strickland*. *See, e.g.*, *Alexander*, 775 F.2d at 602 (petitioner "raised no cognizable claim" where "at no place did [he] give any indication of who the uninterviewed witnesses might be, or the subject matter of their potential testimony, or what defense they might tend to establish").

- 10 -

Savunen, Lutz, and Johnson relate that during the relevant period, they purchased methamphetamine on occasion from one of the government's witnesses, Steve Jakob ("Jakob"), who was manufacturing it at his residence and an uninhabited house. (*See* Mem. at 15-16). Savunen, who happened to be Jakob's girlfriend (*see* Dkt. 182 at 176), also states that the "methamphetamine laboratory" and other items of "personal property" found in Petitioner's garage on December 19, 2012, in fact belonged to Jakob, and that Petitioner was storing it for him because Jakob and Savunen had been evicted from their home. (*See id.*). These witnesses assert that two other government witnesses, William Wagner ("Wagner"), Johnson's boyfriend, and Clifford Ayers ("Ayers"), assisted Jakob in the manufacturing process. (*See id.*).

Although Petitioner provides a summary of the expected testimony from Savunen, Johnson, and Lutz, he does not demonstrate that they were willing to testify. Indeed, at least Savunen and Lutz were inculpated by the government's witnesses in Petitioner's methamphetamine manufacturing and distribution scheme.[4] Accordingly, it is purely "speculative to conclude that . . . they would have been willing to inculpate themselves for the purpose of exonerating [P]etitioner." *Croney*, 1988 WL 69766, at *2.

---

[4]    For instance, Wagner testified that during 2011 and 2012, he, Savunen, and Lutz shoplifted or purchased methamphetamine-making supplies for Petitioner. (Dkt. 182 at 309-10, 325-26). Ayers provided testimony to the same effect. (*Id.* at 645-47). Wagner and Ayers also saw Savunen and Lutz go into the back room behind Petitioner's bedroom where he made methamphetamine. (*Id.* at 356, 658). Jakob testified that he and Savunen sold methamphetamine for Petitioner in 2012. (*Id.* at 777-78). Casey Delzell ("Delzell") testified that she purchased methamphetamine from Lutz a few times and that she knew that Lutz had shoplifted supplies for Petitioner. (*Id.* at 516-18). Lutz was with Petitioner when the police executed the December 30, 2012 search warrant. (Dkt. 194 at ¶ 35).

Even assuming they would have appeared and testified as Petitioner hopes, "the testimony of the uncalled witnesses is not considered in a vacuum[;]" instead, "*Strickland* specifically directs that the totality of the evidence be considered." *McCauley-Bey v. Delo*, 97 F.3d 1104, 1106 (8th Cir. 1996) (citing *Strickland*, 466 U.S. at 695).  Looking at the totality of the evidence introduced at trial, the Court finds that their testimony was not material and would not have tended to exonerate Petitioner.  Notably, the fact that Lutz, Savunen, and Johnson allegedly observed Jakob manufacturing and using methamphetamine is wholly cumulative of Jakob's direct testimony admitting to making, selling, and using methamphetamine.  (*See* Dkt. 160 at 8-13).  Further, no other witness— called or uncalled—corroborates Savunen's assertion that the "methamphetamine laboratory" seized on December 19, 2012, from Petitioner's garage belonged to Jakob and was being temporarily stored in Petitioner's garage.  In fact, Wagner and Ayers testified that they never saw Jakob manufacturing methamphetamine at Petitioner's house and that Jakob was not living there.  (Dkt. 182 at 343-44, 676-77).  Moreover, Savunen's proposed testimony does not account for the large quantity of other evidence that Petitioner was manufacturing methamphetamine, which law enforcement officers discovered inside Petitioner's residence during execution of the search warrants—the two additional "one-pot" methamphetamine processes that Investigator Jeffrey Gotschall testified were retrieved from within the residence, as well as drug paraphernalia, materials for selling drugs, items containing methamphetamine residue, and various methamphetamine components found in Petitioner's bedroom.  (*See* Dkt. 184 at 71-72, 130-31, 182-83, 188-95).  Savunen's proposed testimony does not attribute ownership of these items to Jakob

or anyone else.  In other words, even assuming the truth of Savunen's assertion about the items in the garage, it does not raise a reasonable doubt as to whether Petitioner was manufacturing and distributing methamphetamine at his residence.

"[T]here is no prejudice if, factoring in the uncalled witnesses, the government's case remains overwhelming." *Armstrong v. Kemna*, 590 F.3d 592, 605 (8th Cir. 2010) (quotation omitted).  As discussed *infra* under Section 2(b), multiple witnesses testified about having personally observed Petitioner making methamphetamine and selling it out of his bedroom.  From Petitioner's residence, law enforcement officers retrieved a quantity of methamphetamine along with the supplies, components, and equipment Petitioner used to manufacture methamphetamine and package it for sale.  Based on the "overwhelming strength," *id*. at 605, of the government's evidence that Petitioner was solely responsible for the methamphetamine production and distribution occurring at 7112 State Route 226, there is no reasonable probability that the outcome of the trial would have been different had the uncalled witnesses testified.

### b. Claim that Mr. Smith Failed to Request a Jury Instruction on Informant Testimony

Petitioner next faults Mr. Smith for failing to request the following instruction be given to the jury about how to weigh informant testimony:

> The testimony of an informer who provides evidence against a defendant for pay, or for immunity from punishment, or personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the informer's testimony has been affected by interest or by prejudice against a defendant.

(Mem. at 17 (quotation omitted)).  Although Petitioner does not identify which witness he believes was an informant, he presumably is referring to Samuel Hackett, Jr. ("Hackett"), the only witness who participated in a controlled buy from Petitioner and could be considered an informant.

Relying primarily on *United States v. Luck*, 611 F.3d 183 (4th Cir. 2010), Petitioner contends that several circuits have held that such an instruction is "always mandatory" whenever an informant testifies for the government.  (Mem. at 17).  However, the Fourth Circuit in *Luck* did not state that an informant instruction is "always mandatory"; instead, it simply noted "a consensus [among other circuits] that an informant instruction is necessary *when the informant's testimony is uncorroborated by other evidence*."  *Luck*, 611 F.3d at 187 (emphasis supplied).  In *Luck*, the government's case was based "entirely" on testimony from a paid, professional informant, and there was "little" corroborating evidence of the defendant's guilt.  *Id.* at 190.  The defendant argued that trial counsel's failure to request an informant instruction was professionally unreasonable.  The Fourth Circuit agreed, explaining that "a reasonable lawyer would have been concerned that uncorroborated testimony of paid informants could have been 'manufactured . . . out of whole cloth' for the benefit of the information alone."  *Id.* at 188.  The Fourth Circuit explicitly "did not decide the question of whether and when an informant instruction is required [because] [t]his [was] a classic case of a professional informant paid for his services, which . . . [made] [this] an obvious case for an informant instruction."  *Id.*  Thus, contrary to Petitioner's contention, *Luck* did not hold that an informant instruction is mandatory any time the government relies on testimony from an informant.

- 14 -

In any event, *Luck* is distinguishable from this case for a few reasons.  First, no witnesses were paid for their testimony at Petitioner's trial.  Although Hackett was given money by law enforcement to purchase methamphetamine during the controlled buy, he was not paid to testify against Petitioner.  "No Second Circuit precedent provides support for the argument that a paid informant instruction is warranted when witnesses were not paid to testify." *Hsu v. United States*, 954 F. Supp. 2d 215, 221 (S.D.N.Y. 2013).

To the extent that Hackett and some of the government's other witnesses benefited from non-prosecution agreements, that did not transform them into paid informants.  *See id.* ("The [witnesses] were not paid to testify at Hsu's trial.  Hsu's argument that the witnesses' non-prosecution agreements with the [g]overnment made them paid informants lacks any precedent in the Second Circuit.").  In the absence of any controlling precedent indicating that an informant instruction was warranted under the circumstances, Mr. Smith did not act in a professionally unreasonable manner by declining to request a special instruction for informant testimony.

Second, in contrast to *Luck*, there was a mountain of evidence corroborating the informant's testimony.  Prior to the controlled buy, Steuben County Sheriff's Office Investigator Noel Terwilliger ("Terwilliger") "wired up" Hackett with audio and video recording equipment.  The devices were contained in a wristwatch and in a lighter worn by Hackett during the transaction.  From the wristwatch, Terwilliger obtained a complete file (audio and video) depicting, among other things, Petitioner scraping methamphetamine from a glass jar, weighing it out on a digital scale, packaging it, and giving it to Hackett in

exchange for $200 in cash.  During Hackett's testimony, the jury viewed the video, along with still photographs captured from the video.  (*See* Dkt. 183 at 555-70; 605-11).

During the execution of the search warrants on December 19, 2012, New York State Police investigators seized, among other items, two one-pot methamphetamine production processes, a green Army backpack containing a one-pot methamphetamine process and other manufacturing supplies, a blue tote with manufacturing supplies, a large piece of fractured mirror with methamphetamine residue, four coffee filters with methamphetamine residue, and a burn barrel containing hypodermic needles, battery wrappers, Coleman fuel, cold pack wrappers, and various other materials used to manufacture methamphetamine. The liquid from the one-pot process in the backpack yielded 82.58 grams of methamphetamine.  During the execution of the December 30, 2012 search warrant, the police found various methamphetamine components (lithium batteries, starting fluid, pill grinder, pseudoephedrine pills) and 208.5 grams of marijuana.  (*See* Dkt. 182 at 207-24; Dkt. 184 at 69-92, 98-99, 121-37, 158-60, 170, 182-98; Dkt. 194 at ¶¶ 32-37).

In addition to this physical evidence, numerous witnesses personally observed Petitioner manufacturing and distributing methamphetamine.  For example, Wagner testified that in the middle of 2010, Petitioner started experimenting with making methamphetamine, and the two of them had conversations about the manufacturing process.  Wagner observed Petitioner conducting different parts of the process and assisted him with certain tasks.  By the end of 2012, Wagner was at Petitioner's house four or five times a week, and on each occasion, Petitioner was making or had made methamphetamine. The day before the first search warrant was executed, he saw Petitioner engaged in various

- 16 -

stages of the process; after they learned of the impending police raid, Wagner helped Petitioner pack up the manufacturing supplies and put them into plastic tubs.  (*See* Dkt. 182 at 300-04, 323-24; Dkt. 194 at ¶¶ 38-39).

Jakob testified that Petitioner fronted him ten to fourteen grams of methamphetamine a few times a week for several months in 2012, some of which Jakob would sell for Petitioner and some of which he would use himself.  Jakob sometimes was paid in pseudoephedrine pills which he in turn gave to Petitioner.  After he stopped selling methamphetamine for Petitioner, Jakob continued to obtain the drug for himself a couple times a week and saw Petitioner sell it to at least five other people.  Jakob witnessed Petitioner cooking methamphetamine in the room off Petitioner's bedroom and assisted Petitioner by bringing him supplies during the process.  They also talked and shared knowledge about the manufacturing process.  (*See* Dkt. 187 at 777-89; Dkt. 194 at ¶ 46).

Richard Hagenow ("Hagenow") assisted Petitioner in the manufacturing process by burning garbage, washing containers, stripping batteries, and retrieving cold packs; he observed Petitioner complete various parts of the process, and the two discussed it on several occasions.  Hagenow obtained methamphetamine daily from Petitioner and witnessed Petitioner providing it to others.  (*See* Dkt. 183 at 448-51, 453-58; Dkt. 194 at ¶ 48).

Ayers did not see Petitioner making methamphetamine but believed he was doing so based on the materials that he and others were bringing to Petitioner, the fact that he obtained about one gram of methamphetamine a day from Petitioner throughout 2011 and

2012, and his observations of others getting methamphetamine from Petitioner.  (*See* Dkt. 187 at 643-44, 650-51, 658; Dkt. 194 at ¶ 43).

Delzell bought methamphetamine from Petitioner a few times a week for six months in 2012 and obtained methamphetamine-making supplies for him.  (*See* Dkt. 183 at 510-15; Dkt. 194 at ¶ 49).

Given the substantial amount of evidence corroborating Hackett's testimony, and the fact that there were no paid witnesses at Petitioner's trial, there is no reasonable possibility of a different verdict even if an informant instruction had been issued to the jury.  *Cf. Luck*, 611 F.3d at 190 (finding a reasonable probability of a different outcome where the "government's case was built entirely on a foundation of paid informant testimony," there was "minimal physical evidence," and "[n]o government agent had ever observed Luck engaged in drug activity").  In fact, Petitioner concedes that the "general instructions on witness credibility [issued here] contained all of the elements of the informant instruction."  (Mem. at 20).  For these reasons, Petitioner cannot demonstrate prejudice resulting from Mr. Smith's failure to request such an instruction.  *See*, *e.g.*, *Urena v. Lape*, 715 F. Supp. 2d 325, 333 (E.D.N.Y. 2010) (finding that petitioner was not prejudiced by the absence of a specific jury charge where the trial court conveyed the same underlying principles to the jury as those present in the omitted instruction).

### c. Claim that Mr. Smith Failed to Argue National Sentencing Disparities

The last error attributed to Mr. Smith is the failure to argue national disparities in sentences for defendants convicted of methamphetamine manufacturing and distribution.

(Mem. at 21). Petitioner acknowledges that Mr. Smith argued for a sentence in line with the 150-month sentence imposed by a different judge of this District in the then-recent case of John Barton, who had been convicted of manufacturing and distributing methamphetamine and possessing a firearm. (*See* Dkt. 164, Dkt. 186). Nonetheless, Petitioner contends that Mr. Smith was required to do more. (Mem. at 22 (citing *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017)). The government responds that Petitioner has not shown prejudice because he has failed to substantiate his claim that his sentence was out of line with national statistics and that Mr. Smith made the strongest arguments he could make at sentencing. (*See* Dkt. 203 at 22-26).

At the outset, the Court notes that neither *Jenkins* nor any other Second Circuit case has held that trial counsel is *per se* ineffective for failing to argue national sentencing disparities. *Jenkins* instead involved the reversal of a sentence as substantively unreasonable, not a claim of ineffective assistance of counsel. Petitioner appears to argue that its rationale dictates this Court's evaluation of prejudice stemming from Mr. Smith's alleged error. As discussed below, Petitioner has not demonstrated that Mr. Smith was ineffective or that *Jenkins* is applicable to his case.

The defendant in *Jenkins* was convicted of possessing and transporting child pornography and was sentenced principally to 225 months in prison plus 25 years supervised release. The sentence was within the defendant's Guidelines range and had been accurately calculated by the district court, yet the Second Circuit found it substantively unreasonable. According to the panel, the sentencing factors in 18 U.S.C. § 3553(a)(1) and (a)(2) relied on by the district court—retribution, deterrence,

- 19 -

incapacitation, and the attributes of Jenkins and his crimes—"cannot bear the weight of the sentence . . . imposed." *Jenkins*, 854 F.3d at 188.

In addition, the Second Circuit found, the district court's sentence "created the type of unwarranted sentence disparity that violates [18 U.S.C.] § 3553(a)(6)." *Id.* at 193 (footnote omitted). The Circuit began by noting that "[i]n general, a district court need not consult the Commission's statistics because there is 'no assurance of comparability.'" *Id.* (quoting *United States v. Irving*, 554 F.3d 64, 76 (2d Cir. 2009) (finding "no merit" in defendant's contention that the district court was required to consult Sentencing Commission's statistics regarding sentences imposed locally and nationally on similarly situated offenders)). However, two factors in *Jenkins* warranted a departure from the typical approach.

First, the sentence involved a child pornography Guideline, § 2G2.2, which the Second Circuit previously had held "tends to produce unreasonable results." *Id.* at 193 n.6 (citing *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (noting that § 2G2.2 is "fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what [18 U.S.C.] § 3553 requires")). Second, there were comparable statistics available from the Sentencing Commission which "allow[ed] for a meaningful comparison of Jenkins's behavior to that of other child pornography offenders." *Id.* at 193.

Those factors are not present here. Petitioner has not asserted that any of the Guidelines which were applied in his case "tend[ ] to produce unreasonable results," and the Court has found no authority for that proposition. Petitioner also has not pointed to any

relevant national statistics, much less any that are sufficiently comparable to allow a "meaningful comparison" between his sentence and that of other similarly situated defendants.   *See Irving*, 554 F.3d at 76 (comparable statistics include "individual circumstances" and "'reflect the enhancements or adjustments for the aggravating or mitigating factors that distinguish individual cases'") (quoting *United States v. Willingham*, 497 F.3d 541, 544 (5th Cir. 2007)).   Nor has Petitioner shown that his sentence in fact was "extremely excessive" when compared to other similarly situated defendants; he simply asserts that unspecified national statistics "would have certainly demonstrated" "a reasonable probability" that it was.   (Mem. at 23).

The Second Circuit "requires some objective evidence other than [Petitioner]'s assertions" to show prejudice from counsel's alleged errors.   *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003) (citation omitted); *see also*, *e.g.*, *DeCarlo v. United States*, No. 11-CV-2175, 2013 WL 1700921, at *4 (S.D.N.Y. Apr. 17, 2013) ("'[P]urely speculative' arguments about the impact of an error do not establish prejudice.") (quoting *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991)).   The lack of comparable, favorable statistics is fatal to Petitioner's ability to show prejudice due to Mr. Smith's omission.   *See*, *e.g.*, *United States v. Simmons*, 501 F.3d 620, 626 (6th Cir. 2007) (defendant's proffer of a single example of an alleged similarly situated defendant who received a lesser sentence was insufficient to show an unwarranted sentencing disparity).   Likewise, it prevents the Court from finding that Mr. Smith unreasonably overlooked a colorable argument.   *See Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) ("[T]he failure to include a meritless argument does not fall outside the wide range of professionally

competent assistance to which Petitioner [i]s entitled [under *Strickland*].") (quotation, quotation marks and footnote omitted).

Finally, the Court notes that Mr. Smith did address the need to avoid unwanted sentencing disparities. He presented a detailed, cogent argument in the presentencing memorandum and at the hearing that the sentence received by John Barton, who had been convicted of more serious offenses, should be the reference point for determining Petitioner's sentence. Indeed, even the Government conceded that there were "certainly some [similar] factors" between the Barton case and Petitioner's case. (Dkt. 186 at 41). This Court also expressly considered the need to unwanted sentencing disparities. (*Id.* at 55-56). That the Court did not agree with Mr. Smith's argument based on the John Barton case does not mean he performed ineffectively at sentencing. *See*, *e.g.*, *Ramos v. Artuz*, 40 F. Supp. 2d 206, 208 (S.D.N.Y. 1999) ("Even though counsel's strategy was ultimately unsuccessful, that fact does not render his assistance constitutionally ineffective.") (citing *United States v. DiTommaso*, 817 F.2d 201, 215 (2d Cir. 1987)).

### 3.   Ineffective Assistance of Appellate Counsel

Petitioner asserts that Mr. Ovsiovitch was ineffective in failing to argue that the Court erroneously denied his request for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). (Mem. at 27-28). The government responds that the decision to omit such a claim from Petitioner's appellate brief was objectively reasonable and did not prejudice his appeal.

Petitioner's claim of ineffective assistance of appellate counsel must be judged according to the two-pronged *Strickland* standard. *See*, *e.g.*, *Abdurrahman v. Henderson*,

897 F.2d 71, 74 (2d Cir. 1990).  Appellate counsel will not be faulted simply for declining to pursue every possible claim of error, even nonfrivolous issues requested by the petitioner.  *See Jones v. Barnes*, 463 U.S. 745, 754 (1983) (stating that "[n]othing in the Constitution or [the Supreme Court's] interpretation of that document requires" a standard pursuant to which appellate counsel has "a duty raise every 'colorable' claim suggested by a client") (footnote omitted).  "Th[e] process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones*, 463 U.S. at 751-52).  Reviewing courts "are not to 'second-guess reasonable professional judgments' by appellate attorneys as to what are the most promising issues for appellate review." *Tsirizotakis v. LeFevre*, 736 F.2d 57, 65 (2d Cir. 1984) (quoting *Jones*, 463 U.S. at 754).  With the foregoing principles in mind, the Court will evaluate the relative strength of the omitted issue.

The Supreme Court ruled in *Franks* that although a law enforcement affidavit is entitled to a presumption of validity, a defendant is entitled to a hearing to challenge the truthfulness of the affiant's statements in certain circumstances.  *United States v. Awadallah*, 349 F.2d 42, 64 (2d Cir. 2003) (citing *Franks*, 438 U.S. at 164-72; other citation and footnote omitted).  To obtain a *Franks* hearing, the defendant must "make[ ] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause. . . ." *Franks*, 438 U.S. at 155-56.

In the omnibus motion, Mr. Smith argued that a *Franks* hearing was necessary because one or more of the search warrant applications included a false statement by Hackett—that he had worn a wire and purchased methamphetamine from Petitioner during a controlled buy. (*See* Dkt. 23-1 at 84-85). As proof, Mr. Smith submitted a guest check on which Hackett allegedly wrote he "never wore a wire on John Fernandez [sic]", "No threts [sic] Just Questions", and "never bought meth ever". (*Id.* at 85). It is dated and signed by Hackett, but it is not notarized. (*Id.*). Finding that the guest check was "not an affidavit and [was] difficult to decipher," Magistrate Judge Feldman determined that it was "clearly insufficient to meet the defendant's burden under *Franks* of making a preliminary showing that a material[,] false statement was included in the warrant affidavit," and he recommended denying the motion for a *Franks* hearing without prejudice. (Dkt. 26 at 3).

Mr. Smith objected to the Report and Recommendation, arguing that the guest check "can be read to say that Samuel Hackett never wore a wire on Jonathan Fernandes and never bought methamphetamine, ever. In the search warrant application, Samuel Hackett, [who is,] according to the government[,] CI#1, wore a wire and purchased methamphetamine from Jonathan Fernandes. The inconsistencies between the above two statements are obvious." (Dkt. 28 at 3).

Adopting the Report and Recommendation in full, the Court agreed that Petitioner had not satisfied his burden of making a substantial preliminary showing under *Franks* because the guest check was difficult to decipher and lacked an affidavit explaining its context or origin. (Dkt. 39 at 7 (citing, *inter alia*, *United States v. Orozco-Prada*, 732 F.2d 1076, 1089 (2d Cir. 1984) (affirming denial of *Franks* hearing where the defendant "made

no offer of proof and did not submit a sworn or otherwise reliable statement of a witness")). The Court noted that if Petitioner were to submit an affidavit or other materials supplementing the guest check, he might be entitled to reconsideration of the *Franks* motion.

To this day, Petitioner has not come forward with any supplemental information regarding the guest check. Instead, he merely reargues points raised in the omnibus motion. (*See* Mem. at 27 ("The Petitioner contends that the notation, attached to his Omnibus Motion ([Dkt.] 23-1, filed July 11, 2014), demonstrates that CS #1 did not purchase methamphetamine from Petitioner. Accordingly, Petitioner's affidavit for the December 19, 2012, search warrant contains knowingly false material statements.")). Given that the *Franks* issue had already been thoroughly argued by Mr. Smith and found meritless by two judges, it was not unreasonable for Mr. Ovsiovitch to decide it was a relatively weak claim that was not worth pursuing.

Petitioner also has not demonstrated prejudice stemming from Mr. Ovsiovitch's decision to omit the twice-rejected *Franks* claim. In the appellate context, *Strickland* prejudice means a "'reasonable probability' that [the] claim 'would have been successful before the [state's highest court].'" *Mayo v. Henderson*, 13 F.3d 528, 536 (2d Cir. 1994) (quotation omitted; alterations in original). Petitioner states that "there is always a good probability that the Second Circuit may have decided the issue of a *Frank*'s [sic] hearing differently." (Mem. at 28). That assertion is belied by the Second Circuit's case law cited by this Court in denying the *Franks* motion as well as the Supreme Court's admonition in *Franks* that "[a]ffidavits or sworn or otherwise reliable statements of witnesses should be

furnished, or their absence satisfactorily explained." 438 U.S. at 171. Here, Petitioner did not produce an affidavit or otherwise reliable witness statement; nor did he explain the absence of such statements. Both this Court and Magistrate Judge Feldman pointed out these deficiencies in Petitioner's offer of proof, but he has never come forward with the requisite documentation. It is well settled that speculation and conjecture about the possibility of success on appeal is insufficient to fulfill *Strickland*'s prejudice prong. *See*, *e.g.*, *Delgado v. Griffin*, No. 16CV1313 (ER) (DF), 2020 WL 5752119, at *22 (S.D.N.Y. June 15, 2020), *report and recommendation adopted,* No. 16CIV1313ERDCF, 2020 WL 5751600 (S.D.N.Y. Sept. 25, 2020) ("When asserting that an alleged failure by counsel caused the requisite prejudice, a petitioner cannot rely on vague or speculative allegations.") (citing *Carter v. McKoy*, No. 09cv1030 NRB, 2010 WL 3290989, at *7 (S.D.N.Y. Aug. 9, 2010) (stating that "[v]ague and conclusory allegations are not sufficient to demonstrate either that counsel was ineffective or that the petitioner suffered actual prejudice"); *Kemp v. New York*, No. 07cv6996 (RMB) (HBP), 2009 WL 306258, at *14 (S.D.N.Y. Feb. 9, 2009) ("Vague and speculative allegations such as these are insufficient to establish the prejudice required by *Strickland*.")).

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Petitioner's motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence (Dkt. 198) is in all respects denied and dismissed. The Clerk of Court is directed to close case number 6:18-cv-06507 EAW.

The Court declines to issue a certificate of appealability because Petitioner has failed to make a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253(c).

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:        February 2, 2022
              Rochester, New York

- 27 -